**Thomas SALDI,**

v.

**PAUL REVERE LIFE INS. CO., et al.**

**No. CIV.A. 99–6563.**

United States District Court,
E.D. Pennsylvania.

Aug. 13, 2004.

Alan H. Casper, Philadelphia, PA, Jeffrey K. Rubin, Kenneth R. Friedman, Richard Friedman, Friedman, Rubin & White, Anchorage, AK, for Plaintiff.

Andrew F. Susko, James M. Dunn, White & Williams LLP, John F. Barrett, Rawle & Henderson LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM AND ORDER

SURRICK, District Judge.

Plaintiff, Thomas Saldi, ("Plaintiff") commenced this action against Defendants Paul Revere Life Insurance Company, Provident Companies, Inc., Provident Life and Accident Insurance Company of America and Affiliates, and UnumProvident Corporation (collectively, "Defendants"), alleging that Defendants' termination of Plaintiff's disability benefits was unreasonable and in bad faith, constituting a breach of Plaintiff's insurance contract (Count 1), a breach of the covenant of utmost fair dealing (Count 2), a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 PA. STAT. ANN. § 201–1, *et seq.* (Count 3), and a violation of Pennsylvania's Bad Faith statute, 42 PA. CONS. STAT. ANN. § 8371 (Count 4). Presently before the Court are Defendants' Objections (Doc. Nos. 52 and 59) to Magistrate Judge Arnold C. Rapoport's Orders dated January 3, 2001 and March 6, 2001 (Doc. Nos. 49 and 57) pursuant to 28 U.S.C. § 636(b)(1)(A), and Defendants' fifth

Motion for a Protective Order (Doc. No. 80), which requests a protective order with respect to Plaintiff's Fourth Set of Requests for Production of Documents, Plaintiff's Third Set of Requests for Admissions, and Plaintiff's Fourth Set of Interrogatories pursuant to Federal Rule of Civil Procedure 26(c). *See* LOCAL R. CIV. P. 72.1(IV)(a). For the following reasons, we will affirm the Discovery Orders (Doc. Nos. 52 and 59) as modified herein and we will grant the Fifth Motion for Protective Order (Doc. No. 80) in part and deny it in part as provided herein.

### I. Factual and Procedural Background [1]

Plaintiff alleges that he purchased an "own occupation" private long-term disability insurance policy from Paul Revere Insurance Company ("Paul Revere") in 1990. (Pl. Compl.¶¶ 19–20.) At that time, Plaintiff was the general manager of Bucks County Roses, a large, commercial rose grower. (*Id.* ¶ 21.) In or about January of 1992, Plaintiff was diagnosed with multiple sclerosis ("MS"), a progressive, degenerative disease of the central nervous system. (*Id.* ¶ 25.) On or about April of 1996, Plaintiff stopped working at Bucks County Roses, allegedly because his MS prevented him from working in the elevated temperature and humidity of the greenhouse. *Id.* ¶ 26. On or about June 6, 1996, Plaintiff applied for long-term disability benefits under his policy, claiming that he was totally disabled in his own occupation. (*Id.* ¶ 27.) Paul Revere determined that he was entitled to such benefits and began payments. (*Id.* ¶ 28.) Provident Companies ("Provident") acquired Paul Revere and completed its merger with Paul Revere in March 1997.[2] *Id.* ¶ 5. In 1998, Unum Life Insurance Company of America acquired and merged with Provident to create Defendant UnumProvident Corporation ("UnumProvident"). (*Id.* ¶ 11.) After approximately seventeen months of paying benefits, Plaintiff's benefits were terminated on or about February 17, 1998. (*Id.* ¶ 31.)

---

1. We provide this brief summary of the facts as they are alleged in Plaintiff's Amended Complaint (Doc. No. 14) and Plaintiff's Response to Defendant's Motion for a Protective Order (Doc. No. 19).

2. Provident is the parent company of Defendant Provident Life and Accident Insurance Companies of America and Affiliates ("PL & A").

Plaintiff alleges that the decision to terminate his benefits was made by Paul Revere, Provident and PL & A, acting jointly as part of a national pattern and practice to boost corporate profitability by terminating valid disability benefits for pretextual reasons. (*Id.* ¶ 38.) At the time, Defendants explained that they based their decision on an investigation by Genex Services, Inc. ("Genex"), which concluded that Plaintiff was no longer totally disabled because his doctor had said that he was capable of performing all of the duties of his occupation. (*Id.* ¶¶ 31–32.) Plaintiff alleges that Genex is a wholly owned subsidiary of Provident and UnumProvident, and that the Genex investigation was replete with factual inaccuracies and material misrepresentations that the Defendants either knew about or recklessly disregarded.[3] (*Id.* ¶¶ 33–34.) Specifically, Plaintiff argues that the Genex investigator misrepresented the temperature and humidity of the greenhouse and the amount of time Plaintiff had to spend in the greenhouse in order to establish that Plaintiff was able to return to his former occupation, despite his doctor's insistence that he could not work in elevated temperatures. (*Id.* ¶ 35.)

In his submissions, Plaintiff alleges that in the late 1990s Defendants' profits were suffering due to poor management decisions in their past pricing and structuring of insurance policies. (Pl. Resp., Doc. No. 19, at 8.) Plaintiff explains that from the mid 1980s to the early 1990s, insurance companies, including Provident and Paul Revere, were involved in an intense competition for the sale of individual disability policies, and had "poorly underwritten and underpriced" their non-cancelable, guaranteed renewable, own occupation policies, such as Plaintiff's policy. (*Id.*) Those insurance companies found that after a peak in 1990, their profits began to fall because claims were being made and depleting their reserves. (*Id.*) Plaintiff alleges that as a result, companies started redesigning and repricing their policies, as well as changing their claims processes. (*Id.* at 8–9.) Plaintiff alleges that Provident went from a "claim payment" orientation to a "claim management" orientation, meaning that Provident set a budget for claim payments and focused on terminating claims in order to keep payments within the budget. (*Id.* at 9.) Plaintiff supports these assertions of the underpricing of policies and its effects by providing this Court with a number of documents obtained from Provident in other similar litigation. (*Id.*)

Plaintiff also cites evidence obtained through other litigation that Provident attempted to increase claim terminations by brainstorming grounds for termination at "roundtables" and by shifting its use of Independent Medical Examinations ("IME") from their previous role of evaluating claims fairly to a new role as part of the claim termination process. (*Id.* at 10.) Plaintiff also alleges that Provident attempted to terminate Plaintiff's policy by redefining Plaintiff's occupation to an occupation that Plaintiff was still capable of performing. (*Id.*) Plaintiff has offered evidence that Provident attempted this same technique to terminate another individual's disability benefits. *See Brosnan v. Provident Life and Accident Ins. Co.*, 31 F.Supp.2d 460, 464 (E.D.Pa.1998) (considering Provident's argument that the plaintiff, who had applied for benefits as a anesthesiologist, was not totally disabled because he could still work as a general practitioner to be "disingenuous at best").

Following correspondence with Defendants and the apparent decline of Plaintiff's health[4], Plaintiff filed the instant lawsuit on December 27, 1999. Defendants reinstated Plaintiff's benefits "subject to a reservation of rights" in June of 2000. On June 30, 2000, Defendants' counsel informed the Court during a hearing that the only reservation was that Plaintiff undergo an independent physi-

---

**3.** Plaintiff provided a copy of UnumProvident's "Letter to Our Shareholders" from its 1999 Annual Statement in which the chief executive officer indicates that Genex is a subsidiary of UnumProvident that is involved in return-to-work programs and lost-time management for employers. (Pl. Mem. of Law, Doc. No. 19, Ex. "GG".)

**4.** In August of 1999, Plaintiff submitted Medical Reports from a December 1, 1999 Neuropsychological Evaluation and a July 12, 1999 doctor's visit that state that Plaintiff's cognitive ability had become impaired and that Plaintiff's cerebral MRI showed an "increased lesion burden." (Pl. Compl.¶ 43–45.)

cian examine to determine that he was totally disabled under the policy. (Hearing Trans. at 26–7, Doc. No. 31.) Counsel has represented that Plaintiff is currently receiving benefits; however, Plaintiff's counsel alleges that Defendants still reserve their rights to dispute those payments at trial and, ultimately, to have a jury determine whether Plaintiff is required to pay back Defendants for the payments received.

Defendants filed their First Motion for a Protective Order (Doc. No. 17) on May 5, 2000, objecting to Plaintiff's First and Second Requests for Admission and First Request for Production of Documents. That Motion objected to 179 of the 184 requests for documents. Defendants filed their Second Motion for a Protective Order (Doc. No. 23) on June 5, 2000, objecting to Plaintiff's Second Request for Production of Documents. In that Motion, Defendants objected to thirty-nine of the forty requests for documents. Defendants filed their Third Motion for a Protective Order (Doc. No. 28) on June 28, 2000, objecting to Plaintiff's Notices of Deposition. On June 30, 2000, the Court held a hearing, in which the parties agreed to submit their discovery disputes to a magistrate judge. The discovery motions were referred to Magistrate Judge Arnold C. Rapoport on October 20, 2000. On November 14, 2000, Defendants filed their Fourth Motion for a Protective Order (Doc. No. 42), objecting to Plaintiff's Third Set of Interrogatories.

After reviewing the original briefs and hearing oral argument, Magistrate Judge Rapoport ruled on these Motions in two orders. On January 3, 2001, Judge Rapoport denied Defendants' First, Second, and Third Motions for a Protective Order (Doc. No. 49). Pursuant to Defendants' request, Judge Rapoport reconsidered his decision on the First, Second, and Third motions, permitting the parties to submit briefs and hearing reargument. Judge Rapoport denied Defendants' Motion for Reconsideration on March 6, 2001 (Doc. No. 56). Also on March 6, 2001, after reviewing the briefs and hearing oral argument, Judge Rapoport denied Defendants' Fourth Motion for a Protective Order (Doc. No. 57).

Defendants filed objections to Judge Rapoport's January 3, 2001 and March 6, 2001 orders (Doc. Nos. 52 and 59). After the Supreme Court issued its opinion in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the parties had oral argument and supplied the Court with supplemental briefs addressing the effect of the decision on the discovery dispute. In addition, Defendants have filed a fifth Motion for a Protective Order (Doc. No. 80) to prevent the discovery requested in Plaintiff's Fourth Set of Requests for Production of Documents, Plaintiff's Third Set of Requests for Admissions, and Plaintiff's Fourth Set of Interrogatories.

## II. Legal Standard

### A. Review of Magistrate's Decision

Pursuant to the Federal Magistrates Act, a district court may only reconsider a magistrate judge's decision on a non-dispositive pretrial issue such as a discovery order when the magistrate judge's decision is "clearly erroneous or contrary to law." See 28 U.S.C. § 636(b)(1)(A). When a magistrate judge's decision is on a highly discretionary matter, courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard. *See Conway v. State Farm Fire & Cas. Co.,* Civ. A. No. 98–0832, 1998 WL 961365, *1 (E.D.Pa. Dec.11, 1998) (applying a standard of abuse of discretion to a magistrate judge's discovery order in an insurance bad faith claim); *Scott Paper Co. v. United States,* 943 F.Supp. 501, 502 (E.D.Pa.1996) ("The Court may overrule a decision of the Magistrate Judge involving a nondispositive discovery dispute only if the decision is clearly erroneous or contrary to law, or if the Magistrate Judge abused his discretion.").

### B. Discovery Protective Orders

Federal Rule of Civil Procedure 26(b)(1) states that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." However, courts

have the discretion to limit relevant discovery:

The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

FED. R. CIV. P. 26(b)(2).

 It is well established that the party wishing to obtain a protective order has the burden of demonstrating that "good cause" exists for the order. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir.1994); FED. R. CIV. P. 26(c). " 'Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity.' ... 'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing." *Pansy,* 23 F.3d at 786 (internal citations omitted).

The Third Circuit has adopted a general balancing test for courts to apply when considering whether to grant confidentiality orders:

[T]he court ... must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. When the risk of harm to the owner of [a] trade secret or confidential information outweighs the need for discovery, disclosure [through discovery] cannot be compelled, but this is an infrequent result.

Once the court determines that the discovery policies require that the materials be disclosed, the issue becomes whether they should "be disclosed only in a designated way," as authorized by the last clause of Rule 26(c)(7) .... Whether this disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public. Courts also have great deal of flexibility in crafting the contents of protective orders to minimize the negative consequences of disclosure and serve the public interest simultaneously.

*Id.* at 787 (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 HARV. L. REV. 427, 432–33 (1991)). Most commonly, courts condition discovery of confidential documents by preventing the party obtaining the documents from sharing that document with others and by using that document for any use, other than the present litigation. *Id.* Courts are given broad discretion in evaluating the competing interests in discovery disputes so that they have the necessary flexibility to "justly and properly consider the factors of each case." *Id.* at 789.

## III. Discussion

The parties dispute whether Plaintiff is permitted broad discovery related to the Defendants' business practices, procedures and policies in order to find evidence to support Plaintiff's argument that Defendants terminated Plaintiff's claim as part of a bad faith pattern and practice of terminating valid claims to improve Defendants' profits. In support of Plaintiff's argument that these documents are relevant to the instant case, Plaintiff has identified a number of documents obtained through similar litigation against Defendants, which allegedly are evidence of Defendants' bad faith policies and practices regarding the same type of insurance policies as Plaintiff's. From these documents, Plaintiff argues, the Court can infer that other, relevant evidence as to Defendants' bad faith practices exists. In addition, such evidence of Defendants' national policy of bad faith practices in its management of insurance policies like Plaintiff's would be relevant evidence of Defendants' motive, intent, knowledge, common plan or scheme,

absence of mistake or ratification of misconduct when Defendants' denied Plaintiff's claim.

Defendants argue that Plaintiff's requests are merely a fishing expedition and are unconnected to Plaintiff's underlying claim. Defendants argue that discovery should be limited to issues that pertain to the facts of the specific case in order to avoid being unduly burdensome and interfering with Defendants' confidential internal practices.[5]

Defendants cite cases from this district in which courts have decided to limit discovery of bad faith claims to the individualized circumstance of the case. *See, e.g., Dombach v. Allstate Ins. Co.*, Civ. A. No. 98–1652, 1998 WL 695998, *6 (E.D.Pa. Oct.7, 1998) (generally limiting discovery of personnel files, other cases, bonuses and incentives, claims manuals and instructional materials to whether defendants had been knowingly or recklessly unreasonable in that particular case despite allegation that insurer had corporate policy of encouraging unfairly low settlements); *Garvey v. Nat'l Grange Mut. Ins. Co.*, 167 F.R.D. 391, 396 (E.D.Pa.1996) (protecting discovery of claims manual because the internal standards within the manual were trade secrets, were not related to plaintiff's claim about whether his loss was covered under the insurance contract, and because straying from internal procedures does not establish bad faith).

Defendants further argue that this broad-based discovery is prohibited by the aforementioned Supreme Court decision in *State Farm*, 123 S.Ct. 1513. In *State Farm*, the Supreme Court struck down a $145 million jury verdict against an insurance company because it concluded from the evidence and arguments offered at trial that the jury's verdict intended to punish the insurance company for being an "unsavory" business instead of for the harm it caused to the specific plaintiff. *Id.* at 1523. Defendants argue that *State Farm* requires that in order

for evidence of an insurance company's other acts to be considered relevant, and therefore admissible in Plaintiff's case, Plaintiff must show that there is a nexus between the insurer's other actions and the specific harm suffered by the Plaintiff. Defendants allege that there is no such nexus between Defendants' general national practices and the denial of Plaintiff's disability benefits claim. Instead, Defendants argue that the claims handlers individually considered Plaintiff's claim and testified in depositions about their case-specific reasons for denying Plaintiff's claim. According to Defendants, any information about the denial of Plaintiff's claim should be obtained either from the claims handlers' testimony or Plaintiff's claims file, and Plaintiff should not be entitled to investigate Defendants' businesses in an attempt to discover non-existent materials that raise questions about the accounts of the claims handlers and the Plaintiff's claims file.

 While there are some courts that have chosen to limit discovery in bad faith insurance cases after considering individual circumstances, we disagree with Defendant's assertion that the case law broadly limits discovery in all of such cases. Rather, we conclude that courts have consistently held that when a bad faith policy or practice of an insurance company is applied to the specific plaintiff, the plaintiff is entitled to discover and ultimately present evidence of that policy or practice at trial in order to prove that the insurer intentionally injured the plaintiff and to show the insurer's reprehensibility and recidivism in order to assist the jury in calculating appropriate punitive damages. *Id.* at 1523. As the Supreme Court explained in *State Farm*, evidence of the lawful out-of-state conduct of the defendant "may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious" so long as the "conduct had a nexus to the specific harm suffered by the plaintiff." *Id.* at 1522. The

---

5. Defendants also state that these requests seek information that is cumulative or duplicative of information that is available from some other source that is more convenient, less burdensome or less expensive and is already in possession of Plaintiff. Due to the highly relevant nature of many of these requests, we conclude that it is

permissible to burden the Defendants with this discovery, especially in light of the fact that it appears Defendants have already had to produce much of this discovery in earlier litigation. However, to the extent appropriate, we have addressed Defendants' concerns throughout our specific discussion of the discovery requests.

Court's main interest was to prevent the due process problems created when the jury punished the defendant for conduct that "bore no relation to the [plaintiff's] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Id.* Contrary to Defendants' assertions, the Court in *State Farm* did not establish a requirement that the plaintiff provide specific types of evidence to show that there is a sufficient nexus between the actions of the defendant and the specific harm to the plaintiff. Instead, the Court appears to have entrusted the lower courts with determining how to prevent juries from punishing defendants for unrelated prior transgressions.[6]

Even before *State Farm,* Pennsylvania courts recognized that evidence of the defendants' prior acts can be probative when it is related to the harm to an individual plaintiff. For example, the court in *Hyde Athletic Indus. Inc. v. Cont'l Cas. Co.,* 969 F.Supp. 289, 307 (E.D.Pa.1997), indicated that the focus of the bad faith statute is on "whether insurers acted recklessly or with ill will in a particular case, not whether its business practices are reasonable." *Id.* at 307. As *Hyde* explains, the Pennsylvania Insurance Commissioner should be the sole arbiter of what constitutes a reasonable set of business practices for the investigation and evaluation of claims. Defendants argue that the distinctive role of the Pennsylvania Insurance Commissioner prevents juries from considering the reasonableness of insurance business practices. However, even *Hyde* recognizes that evidence of the use of an objectionable business practice in the handling of an individual claim is directly probative of whether that defendant violated the bad faith statute. *Id.* at 307 n. 18; *See also Kosierowski v. Allstate Ins. Co.,* 51 F.Supp.2d 583, 594 (E.D.Pa.1999) (discussing a similar debate over the appropriateness of considering broader industry practice in the context of a bad faith claim and concluding that evidence of an objectionable business practice "would go directly to the problems the bad faith statute intended to redress"). In addition,

*Garvey's* admonition that straying from internal procedures does not establish bad faith does not mean that straying from internal procedures is never probative evidence of bad faith. *See Kaufman v. Nationwide Mut. Ins. Co.,* Civ. A. No. 97–1114, 1997 WL 703175, *2 n. 2 (E.D.Pa. Nov.12, 1997).

■ In the instant case, the main issue that we are faced with is whether the requested discovery will produce relevant evidence that is potentially admissible in the instant action, and whether the likely benefit of that evidence is outweighed by the burden or expense to the Defendants. Because the nature of a discovery determination requires each court to perform an individual determination based on the specific facts of each case, we will hereinafter conduct our own individual balancing evaluation, pursuant to *Pansy,* to determine the relevance of and the need to limit each of the hundreds of discovery requests. In determining what information is relevant to Plaintiff's instant claim, it is helpful to review the requirements of Pennsylvania's bad faith insurance practices statute. A recovery for bad faith pursuant to Pennsylvania's insurance statute requires that the plaintiff show by clear and convincing evidence that (1) the insurer did not have a reasonable basis for denying coverage under the policy and that (2) the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *See Kosierowski,* 51 F.Supp.2d at 588; 42 Pa. Cons. Stat. Ann. § 8371. The burden on a plaintiff in a bad faith claim is substantial because the plaintiff must show the intentional or reckless behavior of the insurer and must negate the possibility of mere negligence. To establish this, a review of the policies and procedures of the companies in order to determine whether those policies instructed claims handlers to act in bad faith or provided them with an incentive structure that led to bad faith actions is necessary.

As the courts in *State Farm, Hyde,* and *Kosierowski* have explained, however, for any evidence of Defendants' actions outside

6. The Supreme Court specifically instructed that when determining whether the defendant's prior transgressions are evidence of recidivism that should be punished more harshly, "the court must ensure the conduct in question replicates the prior transgressions." *Id.* at 1523.

of the instant case to be relevant and potentially admissible in the instant case, there must be some nexus or connection between those actions and the instant case. Here, Plaintiff has submitted a number of documents obtained in similar litigation that provide a proffer of evidence of Defendants' bad faith actions. In addition, it is interesting to note that a plaintiff in California who had the same type of insurance policy from the Paul Revere Life Insurance Company has been successful in establishing to the satisfaction of a California jury that the company denied his disability claim in bad faith by implementing the same national policy that is alleged in the instant case.[7] *See Hangarter v. Paul Revere Life Ins. Co.*, 236 F.Supp.2d 1069 (N.D.Cal.2002). The evidence proffered by Plaintiff provides support for the instant allegations of a pattern and practice of bad faith and supports further investigation into Defendants' internal business practices and policies. Based on this evidence, we find that Plaintiff's requests for more information about Defendants' policies and practices regarding own-occupation insurance policies are reasonably likely to produce relevant information that could contradict Defendants' proffered reasons for denying Plaintiff's disability claim in the instant case.

We recognize that courts are reluctant to open up insurance companies to broad discovery of their internal practices and policies without some kind of prima facie showing that there is a valid reason for the discovery. Often, this reluctance forces plaintiffs to wait until after they depose a number of employees before they can provide evidence of the relevance of this discovery. *See Hall v. Harleysville Ins. Co.*, 164 F.R.D. 406, 408 (E.D.Pa.1996) (requiring defendants to compile and produce information about how many times they had requested consumer credit reports only after depositions of claims handlers showed that defendants had obtained such credit reports). However, as above mentioned, Plaintiff has already provided the Court with sufficient evidence to open the door to discovery. While it is true that the depositions to date of those employees who handled Plaintiff's claim have not produced statements by those employees that they were implementing the insurance companies bad-faith policy to deny valid claims, we agree with Plaintiff that blatant admissions of wrongdoing are not required in order to establish a nexus for discovery. Rather, Plaintiff should be permitted to obtain the requested discovery before continuing with the depositions.

Based on the foregoing, we will affirm Judge Rapoport's decision to deny Defendants' first four requests for protective orders. Judge Rapaport's decision was reasonable and not an abuse of discretion or contrary to law. However, in order to address concerns about trade secrets, confidentiality, and overbroad requests, we will modify Judge Rapoport's decision by including instructions limiting the use and extent of some of the discovery. Specifically, we will limit Plaintiff's requests to cover only the time period after Plaintiff filed his first claim for benefits, in June of 1996. We consider this time period generally adequate for discovery purposes because it will reveal all of Defendants' claims-handling policies and practices that were in place at the time that Defendants were handling Plaintiff's claims. An exception to this time limit will be made for any discovery concerning the formation of Plaintiff's policy. In addition, we will permit discovery in order to explain some pre–1996 documents that Plaintiff has obtained from other cases and to explain some of the development of the current alleged policies. Recognizing that the requested information is about Defendants' business practices and almost always involves information that is proprietary in nature, we will require as a general rule that Plaintiff not exchange or disclose this information to anyone not associated with the case. If Plaintiff seeks to use specific information obtained through these requests for any other purpose, we will require that Plaintiff make such a request to the court at that time.

---

7. Defendants are defending a number of these cases throughout the country. Undoubtedly Defendants have already gathered and produced much of the requested discovery, somewhat lessening the burden of these requests on Defendants.

### A. Defendants' First and Second Motions for a Protective Order

Defendants have objected to Judge Rapoport's January 3, 2001 order denying their First and Second Motions for a Protective Order as they pertain to Plaintiff's First and Second Set of Requests for Production of Documents. Specifically, Defendants object to Questions 5–7, 10–11, and 13–184 in the first set and Questions 185–208, 210–218, and 220 in the second set. Defendants represent that they have already responded to Questions 209 and 219. We will address these requests in groups by subject matter.

#### (1) Bad Faith Business Policy and Practices Regarding Own–Occupation Disability Policies

Plaintiff alleges that Defendants had a policy to terminate valid claims for disability insurance benefits pursuant to their private own-occupation long-term disability benefits policy in order to boost corporate profitability. Plaintiff alleges that Defendants applied this policy when it unreasonably and in bad faith terminated Plaintiff's disability insurance benefits. In order to prove the existence of this policy and that it was applied to Plaintiff, Plaintiff seeks information regarding the development and the existence of the alleged bad faith policy. In *Hangarter*, supra, the court denied Defendant's motion for new trial and for judgment as a matter of law, upholding a jury verdict based upon evidence that Paul Revere and Unum Provident had a comprehensive system of targeting expensive "own-occupation" long-term disability insurance claims with the goal of terminating benefits. *Hangarter*, 236 F.Supp.2d at 1083–86. The evidence established that as part of that system for termination, Paul Revere exhibited bias by selecting a biased independent medical examiner, by not providing the examiner with the plaintiff's description of her work, by discussing the plaintiff's claim in roundtable groups with the purpose of brainstorming how to terminate the claim, and by not including notes of the roundtable discussions in the plaintiff's claim file. *Id.* Testimony at the California trial revealed that Provident executive Ralph Mohney introduced these policies, which included the goal of achieving a "net termination ratio"[8] to Provident, and brought the policies to Paul Revere. *Id.* Evidence was presented that the increasing net termination goals, from 90 percent in 1996 to 104 percent in 1997, provided an incentive for the insurance companies to terminate expensive claims. *Id.* Plaintiff seeks to find similar evidence to prove that this policy existed and that it was applied by Defendants when they terminated Plaintiff's disability benefits. This information would certainly appear to be relevant to Plaintiff's claim.

Generally, Defendants object to these requests as being unrelated to Plaintiff's claim at issue, overly burdensome, and calculated to harass Defendants and generate undue expenses. Defendants also claim that these requests seek information that is part of Defendants' business strategy and is, therefore, confidential and proprietary. We disagree. The information about the development and substance of Defendants' alleged bad faith policy is relevant to Plaintiff's claim and permitting this discovery will not to cause undue hardship to Defendants. Plaintiff wants to use this information concerning the termination of own-occupation disability insurance policies to show that Plaintiff's claim was terminated due to this policy. There is a direct connection between the information that is requested and the specific harm to Plaintiff. In order to protect the proprietary nature of these documents, we will require that Plaintiff not exchange or disclose this information to anyone not associated with this case.

Furthermore, notwithstanding the fact that many of the documents referred to by Plaintiff existed before the merger of Paul Revere with the other Defendants, Plaintiff's allegation of a nexus between the pre-merger policies and the post-merger actions of Paul Revere is sufficient for discovery of the material. Therefore, except in those specific instances where we have limited the time

---

8. A "net termination ratio" is the ratio of the value of terminated claims compared with new claims.

frame for discovery, we will permit the discovery of pre-merger policies.

### a. Development of the Alleged Policy

█ Plaintiff contends that the reason for Defendants' denial of his claim was that Defendants were attempting to make their corporations more profitable after issuing too many expensive disability policies like Plaintiff's. The following requests are relevant to provide evidence that the Defendants had a financial incentive to develop this alleged bad faith policy and that the Defendants knew that such an incentive existed.

#### i. Profitability

Plaintiff has requested any profitability analyses with respect to the type of policy that Plaintiff owned as well as other information regarding "cash flow underwriting," interest rate projections, or the relationship between investment income and premiums charged for individual policies. (Requests 199–200, 215–218.) Plaintiff explains that this information is relevant to show that Defendants knew at the time or learned later that the past pricing structure was not profitable unless they either terminated valid claims or engaged in post-claim underwriting. Plaintiff requests this information from 1990 until the present because he claims that if Paul Revere knew that it was acting in bad faith at the time it sold the policy, that knowledge will affect the jury's punitive damages award.

Defendants argue that this information is irrelevant, proprietary, privileged and confidential information that is at the heart of Defendants' internal business practices. Based on Plaintiff's submissions that show that Provident has acknowledged these past problems with the profitability of insurance policies like Plaintiff's, we consider this profitability information to be relevant to Defendants' state of mind. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

#### ii. Policy Drafting Information

Plaintiff has requested information regarding the drafting of the type of policy issued to Plaintiff. (Requests 210–214.) Plaintiff alleges that this information is relevant to show whether or not Paul Revere at the time the policy was drafted knew or should have known that it would have profitability problems with the policy later. Plaintiff contends that this information will assist a jury in determining a punitive damage award.

Defendants argue that the formation of the policy is irrelevant because Plaintiff has not alleged a problem related to the form of the policy, such as that the policy has been altered, the language violates Pennsylvania law or that he did not receive the policy he thought that he was receiving. In their specific objections, Defendants do not allege that the information about the drafting of the policy is proprietary or confidential.

Based on Plaintiff's submissions that indicate evidence of a flaw in the original policy structure of Plaintiff's policy, we consider this information relevant and discoverable. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

#### iii. Knowledge of the Profitability Problem

Plaintiff has requested documents that show that Defendants had knowledge of the lack of profitability of the own-occupation disability policies. (Requests 57–59.) Plaintiff contends that documents by Defendants that acknowledge the profitability problem establish the reason for Defendants' termination of valid disability claims. Plaintiff asserts that he already has a Provident internal memorandum from Tom Heys to Harold Chandler, dated August 9, 1995, that refers to the own occupation policies issued in the 1980s and early 1990s as the "bad block." We are satisfied that the requested documents are likely to produce relevant evidence. Therefore, we find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

### b. Documents Describing Alleged Policy

█ Plaintiff seeks documents that describe the alleged bad faith policy of Defen-

dants and the different methods that Defendants used to apply the policy to its own-occupation disability policy holders in order to obtain evidence showing that such methods were used against Plaintiff and that Defendants were culpable. We find this information relevant and potentially related to the harm suffered by Plaintiff.[9]

### i. Discussions of the Goal of Termination and its Implementation

Plaintiff requests documents regarding Defendants' alleged goal to terminate as many own-occupation claims as possible in order to improve their financial status. (Request 60.) Setting such goals in itself could be considered bad faith conduct, which could assist the jury in the instant case in determining whether the Defendants were acting in bad faith in the termination of Plaintiff's benefits. Plaintiff has also presented the Court with a number of requests regarding the implementation of strategies, policies, and procedures in order to meet those termination goals. Plaintiff has alleged that the termination of his claim was a result of these termination goals and policies. Therefore, any potential information regarding these goals and policies would clearly be relevant to the specific harm to Plaintiff.

Plaintiff has supported his allegation of the existence of. documents describing these termination goals and how to implement them by providing the Court with documents written by Provident employees that allegedly refer to those goals and strategies or policies to implement them. For example, Plaintiff requests documents relating to Paul Revere's implementation of "stronger claim management techniques," citing an internal memorandum from Ralph Mohney, mentioned above in regards to the *Hangarter* case, to Tom Heys, on April 25, 1995, which states that the "application of stronger claim management techniques resulted in significant savings." [10] (Request 37.) Plaintiff also requests documents that refer to the establishment and implementation of termination goals, citing a Provident internal memorandum from Tom Heys to Harold Chandler on June 9, 1995 discussing the Monthly Risk Management Report and stating that "[w]e continue to improve the termination level and have a good chance of meeting our goal of $132 million of terminations for the quarter." [11] (Request 60–62.) Plaintiff specifically requests information regarding those cost-saving strategies mentioned in the 1995 memo, which include "Tuesday and Thursday" evening "legal review meetings." [12] (Requests 63–64.) To support Plaintiff's allegation that one of Defendants' cost-saving techniques was to shift from a policy of paying own-occupation disability claims to a policy of managing those claims with the goal of terminating benefits, Plaintiff requests documents related to "claims improvement initiatives," "risk management initiatives," "claims strategies," the "claims management" ap-

9. Upon a close examination of the individual discovery requests, there remain a number of requests for which Plaintiff has not established the relevance and/or nexus to his case. We have included discussions of some of these discovery requests throughout our analysis. In addition, we note that Plaintiff has failed to show the relevance of his requests for documents regarding the "board of directors packages," the "top technical consultant process," "scoping team meetings," California's Unfair Settlement Practice, telephone templates for initial interviews, and recommendations from the Psychiatric Disability Consultants (Requests 38–40, 41–43, 117, 126, 181). Therefore, we will not permit discovery pursuant to these requests.

10. Defendants assert that this particular memo referred to the management of equitable policies and not own-occupation policies. We will limit Plaintiff's requests on those "stronger manage-

ment techniques" to those used in the administration of own-occupation disability policies.

11. While Defendants dispute Plaintiff's characterization of those documents, we find the statements in the documents to be sufficient to establish that other relevant evidence potentially exists.

12. Plaintiff contends that part of Defendants' new claims management strategy was to terminate more claims, and that Defendants knew that such a strategy would result in increased litigation costs. Plaintiff seeks documentation of Defendants' knowledge that it would have increased litigation costs as evidence of Defendants' knowledge that *its actions were unreasonable.* (Request 103.) The connection between an increased litigation budget and knowledge of wrongdoing is too tenuous to permit this discovery.

proach to claims handling, and a claims-handling "plan."[13] (Request 27–28, 34–36, 52–56, 75, 94, 120, 151–152, 177.) Plaintiff contends that this shift in claims-handling policy directly affected Plaintiff's ability to receive disability benefits and is evidence of Defendants' reprehensibility. In order to show the direct link with Plaintiff's harm, Plaintiff requests information about the claims-handling policy and results in the Worchester office and how they compared to Defendants' other offices.[14] (Requests 65, 71, 93, 95, 118, 120–121.)

Plaintiff alleges that there were a number of aspects to Defendants' claims handling policy that constituted bad faith, including how Defendants determined that some claims were "illegitimate," Defendants' focus on terminating claims of a certain duration, Defendants' use of roundtable discussions to brainstorm how to save costs on a claim, and Defendants' implementation of employee incentives to terminate claims.[15] Plaintiff contends that each of these policies is evidence of Defendants' bad faith practices when handling disability claims like Plaintiff's and that discovery regarding these policies potentially will yield relevant evidence as to whether they were applied to the denial of Plaintiff's benefits. Since Defendants contend that Plaintiff's claim for benefits was illegitimate,

Plaintiff requests information as to how Defendants' define "illegitimate" claims.[16] (Request 133.) Plaintiff alleges that Defendants adopted a "more proactive stance in defense against" those illegitimate claims, citing a 1996 PL & A document, and Plaintiff seeks information about that "proactive stance." (Request 134.) Plaintiff also contends that Defendants implemented a system of terminating claims on the basis of their duration and has requested any documents related to such a policy.[17] (Request 46.) If such a system exists, it would be relevant to the termination of Plaintiff's benefits, which occurred after he received benefits for seventeen months. Defendants contend that Plaintiff's benefits were terminated after his doctor approved his return to work and not due to this alleged duration-termination strategy. However, the issue of whether Plaintiff's doctor approved his return to work is in dispute. If such a management strategy exists, it would certainly be relevant to determining whether the Plaintiff's claim was targeted due to its duration.

In addition, Plaintiff alleges that Paul Revere imported Provident's practice of having "roundtable" discussions, in which claims handlers met to develop rationales and plans for how to terminate claims based on the

---

**13.** These terms have been referred to in the 1995 budget, internal 1995 memoranda, and internal 1997 memoranda.

**14.** While we find that evidence of the alleged claim termination strategies in general and those strategies applied to either Plaintiff's type of claim or the Worchester office are relevant and connected to Plaintiff's case, we reject Plaintiff's argument that documents related to the expected levels of performance for the "ortho unit," information about "cardiac units," the "major project on claims of floor traders," or the identification of "test" cases have a sufficient nexus to Plaintiff's harm to permit discovery. (Requests 74, 78–79, 171, 174). While information regarding the "ortho units," cardiac units, floor traders, or test cases might potentially provide evidence of the fact that the Defendants set claim termination goals or established unreasonable claims handling behavior, that information is too remote to be useful in Plaintiff's case. Plaintiff's case does not involve an orthopedic problem, cardiac problem, a floor trader, or involvement in a test case.

**15.** Plaintiff also alleges that Defendants' incentive structure with Genex is evidence of Defen-

dants' attempt to implement their bad-faith policy. This structure is discussed below in the section about Genex's relationship with Defendants.

**16.** Similarly, Plaintiff seeks the criteria Defendants used to define the term "high profile opportunities" in order to determine whether Plaintiff was such a "high profile opportunity" based on the high value of his claim (approximately $1 million at time of termination) and to determine whether that was the reason for Defendants referral of Plaintiff to Genex. (Requests 85–86.) We will permit the discovery of information regarding Plaintiff's referral to Genex, including the definition of "high profile opportunities".

**17.** Plaintiff has identified a Provident internal memorandum from Tom Heys to Harold Chandler on May 24, 1996 that refers "enhancing our performance measurement capabilities beyond the rather simplified rations which we now use. Performance indicators in the future will focus more on termination activity at specific claim durations."

dollar value of the reserves of those claims. Plaintiff has requested documents regarding the existence of roundtables and whether they were used to discuss Plaintiff's claim. (Requests 26, 45, 89, 141, 142, 153–159.) Defendants respond that they did not use a roundtable to discuss Plaintiff's claim and that the rest of the roundtable discussions should be kept confidential to protect information regarding other insureds. If information regarding a roundtable discussion about Plaintiff's claim exists, those documents, as well as general information regarding roundtable discussions, would certainly be relevant to Plaintiff's claim. However, the parties dispute whether such roundtable discussions occurred, what claim handler Paul Yranski said regarding any possible discussion, and whether if such a discussion occurred, it would have been recorded in Plaintiff's claim file. Because the parties' dispute appears to be somewhat semantic and because if such documents exist they would be relevant and would establish the relevance of broad information regarding the use of roundtable discussions, we will require Defendants to produce any documents regarding any "roundtable" discussions involving Plaintiff and any discussions among two or more employees about the termination of Plaintiff's claim. If any such document exists, then Plaintiff will be entitled to the rest of the discovery regarding the use of roundt-

able discussions in claims handling. In order to protect the privacy of the information of other insureds, we will require Defendants to redact identifying information from those documents. If Defendants certify that they have no documents, notes or information concerning conversations about the termination of Plaintiff's claim, then Plaintiff will not be permitted to discover general information regarding roundtable discussions.[18]

Plaintiff has also requested information about Defendants' employees, including general information regarding the training, standards and incentive structure for employees and specific information regarding the performance and training of the employees and units that handled Plaintiff's claim. Plaintiff alleges that this information will be relevant to show that Defendants had a plan to terminate expensive claims and implemented that plan, in part, through their structuring of incentives for their employees. Plaintiff contends that these documents will show that Defendants knew about the improper termination actions of their employees and promoted such actions through their discipline, award and training procedures. Generally, we find that the relationship between Defendants and the employees and units that handled Plaintiff's claim is relevant to show the responsibility of the Defendants for the actions of their employees in the termination of

**18.** Plaintiff alleges some bad faith practices by Defendants that were not applied to Plaintiff. Because these practices were not applied to Plaintiff, we will not permit discovery. Such evidence of a general bad faith practice of the Defendants *that did not have any relation to the* Defendants' actions in the instant case is prohibited by *State Farm.* Among those requests without a sufficient nexus are Plaintiff's requests regarding Defendants' practice of hiring biased independent medical examiners. Defendants did not hire an independent medical examiner to evaluate Plaintiff's claim (Requests 81, 97, 127, 178–179). In addition, Plaintiff requests information regarding Defendants use of "SWAT" teams to handle files in the Special Handling Unit and other information regarding the Special Handling Unit, even though Plaintiff's claim was never handled by a SWAT team or in the Special Handling Unit. (Requests 82–84, 90–92, 113–114, 146.) Plaintiff also requests Defendants' reports that track claims based on indemnity amount, called "PING" reports. (Request 101.) We will limit the discovery of the PING reports to those reports that monitored Plaintiff's claim, if any

such reports exist. Finally, Plaintiff has requested information regarding Defendants' "profiling methodology, early intervention nurses, duration and treatment protocols, and field referral to Genex managers," without explaining the specific nexus between those records and Plaintiff's harm. (Request 76.) While we will permit discovery of those methods that were applied to Plaintiff in his instant claim, we will not permit the discovery of the records generally for the sole purpose of establishing evidence of Defendants' mental state. In two other requests that are potentially relevant if they apply to Plaintiff, Plaintiff seeks documents regarding the identification of high litigation risk states and the creation of a separate claims management unit that focused exclusively on claims from high legal exposure states. (Request 130, 147.) If Pennsylvania is considered a high legal exposure state, this separate claims management unit would be relevant to the instant case and the information will be discoverable. If not, this request is too remote and lacks a necessary nexus to Plaintiff's claim.

Plaintiff's claim. Because that documentation is specific to the employees and units involved in Plaintiff's claim, there is a nexus between these requests and Plaintiff's harm.

Addressing the specific terms of each of Plaintiff's requests and Defendants' concerns Plaintiff seeks the personnel files and performance reviews of the employees who handled Plaintiff's claim and their supervisors, including a description of their jobs, training records, personnel evaluations, goal setting documents, and disciplining or rewarding documents, as well as information regarding participation in incentive plans, and their scope of authority in relationship to each other and the plaintiff.[19] (Requests 5–6, 205.) Plaintiff requests much of this information starting from 1992. Plaintiff argues that these documents are relevant for the reasons stated above regarding Defendants' knowledge and ratification of the misconduct of their employees as well as Defendants' improper incentives for employees. Also, Plaintiff argues that former employees have in the past provided relevant information about their former employer's policies and practices. To support his claim, Plaintiff has offered an affidavit from a plaintiff's attorney attesting to the fact that such personnel records were relevant and lead to the discovery of additional relevant evidence in similar cases.

Defendants argue that the personnel files and other related materials are highly confidential and unduly burdensome because there are twenty-five requests per defendant.

However, Defendants have not alleged with specificity why it is necessary to keep these records confidential or what embarrassing or private information might be obtained from the requested documents.

Federal courts have recognized a "heightened standard of relevance" for discovery of information contained in personnel files. *See Kaufman,* 1997 WL 703175 at *1. Courts in this district have refused to permit the discovery of these personnel files when such discovery information about the compensation of claims adjusters or their home addresses was obtainable through other, non-confidential means. *Id.; See also Cantor v. Equitable Life Ass. Soc'y of the United States,* Civ. A. No. 97–5711, 1998 WL 306208, *3 (E.D.Pa. June 9, 1998). In the instant case, Defendants have not identified a less confidential source from which Plaintiff could obtain this material. For the reasons stated above, we find these records to be relevant and have a sufficient nexus to the instant case, and therefore, we will affirm Judge Rapoport's decision to deny Defendants' request for a protective order for these records. However, we will change the relevant dates in the discovery request to June 1996, when Plaintiff first applied for benefits.[20]

Plaintiff has also requested documents regarding the evaluations of any of the individuals or units involved in investigating Plaintiff's claim as well as any documents that explain the criteria and process used in those evaluations.[21] (Requests 138, 193–194.)

---

19. Plaintiff has also requested material regarding field report evaluations. (Request 182.) If the requested evaluation material was applicable to the field agents handling Plaintiff's claim, then we consider the information relevant and discoverable.

20. We have addressed any potential concerns about confidentiality with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

21. Plaintiff specifically requests the criteria used for monitoring the activities, quality and cost for internal staff and outside vendors and other performance standards. (Request 125, 129.) To the extent that records show the standards or criteria for monitoring either the employees or units related to Plaintiff's claim or other employees or units handling similar own-occupation disability claims, there exists a sufficient nexus to support discovery. Such documentation is relevant to show the pressures and incentives for the employees and units handling Plaintiff's claim or handling claims of the same type as Plaintiff's claim. Plaintiff also seeks documents related to the Defendants' decision to focus their attention on one of the general claim units which experienced unusually low results and to hire a consultant to review 824 low resolution potential cases. (Request 102, 149.) To the extent that these requests seek information about either the unit that handled Plaintiffs' claim or a unit that handled other own-occupation disability claims, we will permit the discovery. To the extent that Plaintiff's claim or other similar own-occupation claims are among the 824 low resolution cases referenced in the above request, we will permit the discovery. Similarly, Plaintiff seeks all of the templates for the management of claims that Defendants have created. (Request 143). These

Plaintiff alleges that these documents will show the relationship between the Defendants and the employees who handled Plaintiff's claim. In addition, documents regarding Defendants' criteria for evaluation and the development and implementation of a quality assurance program designed to evaluate the performance of claim representatives would identify information about the corporate philosophy, standards, and procedures.

Defendants object to this request, arguing that this information is training material and is irrelevant, proprietary, privileged, and confidential. For the reasons explained above, we find that the evaluation materials are relevant to Plaintiff's claim and are discoverable. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.[22]

In addition, Plaintiff seeks information about the awards and financial bonus programs for which the claims personnel could qualify, as well as information about specific awards that Plaintiff learned about in other litigation. (Requests 161–162, 195–196, 201–204.) Plaintiff alleges that the incentives offered to employees will provide evidence of the motivation of those employees. Defendants allege that this information is irrelevant, proprietary, privileged, and confidential, without providing a specific explanation.[23]

We consider these documents relevant to show Defendants' state of mind as well as their relationship with the employees who handled Plaintiff's claims. We find Judge Rapoport's denial of the protective order as

to this information to be reasonable and not contrary to law or an abuse of discretion.

Plaintiff requests that Defendants provide Plaintiff with all of the training materials used to train those employees who handled Plaintiff's claim. (Request 7.) Plaintiff argues that training materials are relevant to show Defendants' relationship with these employees as well as Defendants' policies, procedures, corporate philosophy, and corporate knowledge of these claims-handlers' actions.

Defendants state that the training materials are not relevant to Plaintiff's claim and are confidential and proprietary business information. In their supplemental brief (Doc. No. 22), Defendants argue that Plaintiff cannot establish that Defendants' manuals, policies or procedures are relevant to Plaintiff's termination without deposing the individual claims handlers and having evidence from those claims handlers that they made their decisions based on those manuals, policies and procedures. We disagree. Plaintiff has established the relevance of this training information and general information about Defendants' policies and procedures by providing evidence of Defendants' bad faith practices in similar claims. These requests focus on the nexus between Defendant's national policies and their effect on the training of those claims handlers who examined Plaintiff's claim. We consider these documents to be relevant, and they should be produced for Plaintiff. *See Cantor*, 1998 WL 306208 at *2 (ordering insurance company to produce all educational materials used in training of those who were involved in handling plaintiff's claim). Fur-

---

templates are relevant if they are applicable to Plaintiff, to rebut Defendants' argument that they decided Plaintiff's claim on an individual basis. Since these templates appear to be categorized by type of claims, we find that the only relevant template to Plaintiff's claim is a template about the management of own-occupation disability policies like Plaintiff's and therefore only permit the discovery of that template, if it exists.

**22.** We have addressed any potential concerns about maintaining the privacy of the employees with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

**23.** Defendant also alleges that because none of the claims handlers involved in Plaintiff's claim

received the "Columbo" award, information regarding the award has no nexus to Plaintiff's claim. (Requests 161–162.) In order to ensure that there is a nexus between the requested information and Plaintiff's claim, we will only permit discovery of the "Columbo" award material if it was possible for one of the claims personnel who handled Plaintiff's claim to qualify for the award. If so, the award would be relevant in that it would have been a potential incentive for the employee handling Plaintiff's claim. If those employees could not have qualified for the "Columbo" award, information about the award would be too remote to be discoverable in the instant case.

thermore, we note that Defendants merely make broad allegations that their training materials contain proprietary information. This does not meet the *Pansy* requirement to show specific good cause for a protective order. Recognizing, however, that other courts have found similar materials to require some level of confidentiality, we will require that Plaintiff not exchange or disclose these documents with anyone not associated with this case.

Having sought information regarding those documents used to train the employees handling Plaintiff's claim, Plaintiff additionally requests a number of other training materials, contending that they show corporate knowledge, corporate standards, and/or are evidence of the procedures in use by those employees handling Plaintiff's claim. (Request 98–99–100, 104, 107–108, 124, 128, 136, 137, 144, 145, 148, 160, 163, 165–168, 172, 180, 183.) Defendants allege that these training documents have no nexus to Plaintiff's claim because they were not used to train the employees who handled Plaintiff's claim and many of them were created and used before Plaintiff sought disability benefits.

We find that those documents that include training sessions on the subject matters of handling own-occupation disability policies, handling an insured with alleged drug problems, handling depositions and trial preparation, handling investigations of claims similar to Plaintiff's, and creating and maintaining claim records or field reports are likely to produce information that is relevant to Plaintiff's claim. These training documents on relevant subjects are evidence of Defendants' standards and expectations regarding their employees' conduct on these matters and are discoverable. Plaintiff has not identified a nexus between those documents that do not relate to the enumerated subject matters and Plaintiff's claim, and, therefore, we will not permit discovery of those training materials. In addition, in order to limit the broad sweep of these discovery requests and to ensure that these documents are relevant to the standards of the Defendants at the time that they denied Plaintiff's claim, we will limit the discovery to those policies that were in effect after the date that Plaintiff first applied for employment benefits, in June of 1996.

In addition, Plaintiff seeks information regarding staffing and retention problems that allegedly occurred in the Worchester office. (Requests 77, 106, 115.) Plaintiff contends that these problems show that the employees handling Plaintiff's claim may have had unreasonably heavy caseloads that led to poor performance in their handling of Plaintiff's claim, as well as evidence that Defendants knew of this possibility. Plaintiff also alleges that Defendants' attempts to improve their retention problems might further show the relationship between Defendants and their employees, and the pressures and incentives given to those employees. While Defendants contend that those documents will not show any of the above relevant information, we will affirm Judge Rapoport's decision to permit this discovery as these documents are potentially relevant and connected to Plaintiff's claim.

### ii. Studies Conducted of Claims Management Processes

Plaintiff alleges that Defendants engaged in a number of studies to analyze their claims management strategies and help them improve corporate profits. Among these studies are the 1994 study of Provident Life & Accident Insurance Company's individual disability claim handling operations by the law firm of LeBouef, Lamb, Greene & MacCrae. Plaintiff alleges that the LeBouef study recommended that Defendants involve counsel in claim denial decisions in order to protect mistakes by creating attorney-client privilege over internal memos. The LeBoeuf Report also allegedly explains that every case has an optimal point for the termination of the claim. Plaintiff argues that Defendants used attorneys to handle Plaintiff's claim, and in fact, Defendants contend that the actions of that attorney, Maureen Griffen, are protected by attorney-client confidentiality. Plaintiff alleges that the recommendations show a bad faith corporate state of mind and that the use of an attorney in the handling of his claim is evidence of Defendants' unreasonableness in handling his claim. Plaintiff requests the LeBouef Report itself as well as

any documents referring to its adoption and implementation by Defendants. (Requests 29–30, 131–132, 169–170, 197–198.) Defendants allege that these documents are irrelevant, have no bearing on Plaintiff's instant claim, and are proprietary, privileged and confidential. We find that these documents are relevant to Defendants' state of mind and that Defendants have failed to meet their burden to show that they are protected by any privilege.

Plaintiff also requests a copy of and information regarding the use of the Tillinghast Study, which allegedly studied the frequency and severity of claims in an attempt to develop a forecasting tool. (Requests 31, 50–51, 173.) Plaintiff alleges that the study evaluated the financial gain of certain policies and is relevant to show that Defendants denied Plaintiff's claim in order to increase profits, which is further evidence of Defendants' reprehensibility. To prevent the discovery from being overly broad and from including information that is not relevant to Plaintiff's specific harm, we will limit discovery to those parts of the study that discuss individual own-occupation disability claims like Plaintiff's.

Plaintiff seeks information regarding a validation project and operational audit conducted by Price Waterhouse of Provident Life & Accident Insurance Company around 1995. (Requests 47–49.) Citing an internal memorandum from Tom Heys to Harold Chandler on November 14, 1995, Plaintiff notes that Price Waterhouse outlined the "best practices" for handling claims. Plaintiff contends that this information regarding Defendants' interpretation of "best practices" for the handling of individual disability claims would show either the reasonableness or reprehen-

sibility of Defendants' policies. This information concerning what the Defendants generally considered to be the "best practices" for the handling of individual disability claims is relevant to Defendants' general state of mind and potentially important in relation to Defendants denial of Plaintiff's claim.[24]

Plaintiff also requests those documents related to a claims study conducted by employee Tom Heys of the companies' disability insurance that focused on the "difference that reasonable occupation makes in our claim management efforts as opposed to an own-occupation." (Request 96.) Defendants' analysis of the effect of issuing own-occupation policies instead of reasonable occupation policies is relevant to Plaintiff's claim that Defendants targeted own-occupation policies like his in order to increase their profits because those policies were unduly expensive.[25] We find Judge Rapoport's denial of the protective order as to the documents regarding these studies to be reasonable and not contrary to law or an abuse of discretion.[26]

### iii. Results of Strategies

Plaintiff seeks Defendants' internal documents that record the progress that Defendants were making on implementing the goals and strategies mentioned above. These documents include monthly reports on risk management and individual disability claims, unit supervisor's monthly reports, and documents related to the expense of the new claims initiatives. Plaintiff has provided some of these documents obtained through other litigation. We consider these documents relevant to show Defendants' alleged bad faith methods, and they may be useful in

---

**24.** Plaintiff also requests any other description of the "best practices" approach to claims handling that was implemented in April of 1997, or that was implemented in the Worchester disability insurance units. (Request 87–88.) For the reasons stated above, Plaintiff has established the relevance of such information and its nexus to his claim.

**25.** However, Plaintiff has not provided the Court with sufficient information regarding the alleged McKinsey study to establish a nexus between that study and Plaintiff's harm. Plaintiff requests any documents concerning a meeting between Defen-

dants and McKinsey, which it alleges consulted with Defendants regarding "claims processing." (Request 73.) This information is insufficient for the Court to determine whether the meeting will provide evidence relevant to the denial of Plaintiff's claim.

**26.** We have addressed any potential concerns about the proprietary or confidential nature of these studies with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

determining whether such methods were used against Plaintiff.[27]

Specifically, Plaintiff requests Defendants' Monthly Reports on individual disability claims, which allegedly will show activity in the claims department, including information about claim terminations, personnel training, and the creation and use of round tables to review claims. (Request 185.) Plaintiff also seeks the Monthly Risk Management Reports and Individual Disability Reports from all of the Defendants, in order to show their corporate policies and philosophies, and specifically their treatment of terminating claims and their knowledge of the poor profitability of own occupation policies like Plaintiff's.[28] (Request 188–192.)

Defendants argue that this information is irrelevant, unlikely to lead to the discovery of relevant evidence, and seeks information that is proprietary, privileged and confidential. Defendants do not provide a specific explanation as to why the monthly reports must be kept confidential. Based on our examination of Plaintiff's submissions, we conclude that these documents are relevant, connected to Plaintiff's harm, and subject to discovery. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

Plaintiff also seeks monthly reports from the supervisors of the unit handling Plaintiff's claim to the head of claims at the time, Ralph Mohoney, and Mohoney's responses to those reports. (Requests 24–25.) Plaintiff alleges that these reports identify the pressure on employees to terminate claims, the emphasis on the termination of claims and reduction of reserves, and the fact that termination was reported in a favorable manner. Defendants contend that this request is overly broad because it seeks information regarding other insureds and not Plaintiff.

Since these documents are written by the claim unit handling Plaintiff's claim, the information regarding the attitude of supervisors of that unit towards claim termination and the reduction of reserves is relevant to Plaintiff's specific harm. In order to prevent the request from being overly broad, we will limit the discovery of those monthly reports and responses to those documents that refer to claim termination or the reduction of reserves. In addition, to protect the confidentiality of the other insureds, we will require that Defendants redact any identifying information for other insureds from these documents.

Plaintiff also seeks documents that record the expense, manpower, and staffing changes that were required by the implementation of the claims initiatives. (Requests 32–33.) Plaintiff requests this information based on an attachment to a document that they already have from May of 1995. These documents potentially show that the expenditures for claims initiatives were justified based on the additional number of claims that the companies could terminate. These are also potentially relevant to show the implementation of Defendants' policies. Therefore they are discoverable.

### c. Intent to disregard their own standards

■ Plaintiff has requested the manuals on procedures, ethics, training, and claims handling to show that Defendants knew the

---

**27.** Plaintiff has also requested discovery of "project team reports." (Request 44.) To be discoverable, these team reports would have to have some nexus to the denial of Plaintiff's benefits. Because Plaintiff's request for project team reports does not identify specifically what relevant topics the reports cover or what teams made such reports, the request is overly broad and demands documents that are not related to Plaintiff's claim. Therefore, we will limit the discovery of these monthly reports to those teams that potentially could have discussed Plaintiff's claim, for example those teams that discussed own-occupation claims or Worchester claims. Similarly, Plaintiff has not provided the Court with

sufficient information to show that his request for documents related to the early phases of claim improvement initiatives are related to Plaintiff's claim. (Requests 175–176.) Therefore, we will not require Defendants to produce these documents.

**28.** Plaintiff has established that these reports are also potentially relevant to show the relationship among the Defendants. For example, if claims handling documents for one company are no longer created after the merger, one can infer that the other company has taken over the responsibility of claim management.

appropriate standards for their actions and that they intentionally did not follow them.[29] (Requests 22–23, 139–140, 206–208.) Plaintiff requests these documents from 1990 to the present. Defendants argue that these manuals are irrelevant, privileged, confidential and proprietary. Defendants also contend that some of these documents were not used by the Worchester employees who handled Plaintiff's claim, and, therefore, that they do not have a nexus to Plaintiff's claim.

We find that at least some of these manuals are relevant to Defendants' state of mind. Because Plaintiff seeks to use this information to show that Defendants generally knew what behavior was reasonable and did not act unreasonably in the instant case, the nexus does not require the use of the manuals by those employees involved in denying Plaintiff's claim. Rather, the nexus is based on the fact that Defendants created such manuals and knew of them. Defendants have not identified any way for us to determine if there are parts of these manuals that we should protect. Accordingly, Judge Rapoport's decision to disclose all of the manuals to be reasonable and not contrary to law. However, we will limit the discovery of the manuals to those manuals being used during and after the time that Plaintiff first applied for benefits, June 1996.

Plaintiff also seeks documents concerning Defendants' policies on record retention and file documentation. (Request 13, 184.) Plaintiff contends that Defendants' failure to follow their own document preservation and claim file documentation policies may indicate that Defendants acted unreasonably and in bad faith. As we explained above, because this request seeks to show that Defendants created such policies and did not follow them, it is not necessary to limit this discovery to those policies that were taught to the claims handlers of Plaintiff's claim. Regardless of how such employees were trained, Plaintiff

would potentially be able to demonstrate Defendants' bad faith by showing that the claims handlers who maintained Plaintiff's file did not follow these policies. Defendants allege that the document request is overly broad because it requests documents beginning in 1992. Defendants also indicate that Paul Revere did not have a document retention policy until it implemented Provident's policy after the merger on March 27, 1997. We conclude that Defendants' document retention policies and file documentation policies are relevant to Plaintiff's claim; however, in order to prevent Plaintiff's request from being overly broad, we will limit the discovery to those policies in effect beginning when Plaintiff applied for disability benefits in June 1996.[30]

### (2) Determining Who is at Fault: The Relationship Among the Parties

Plaintiff seeks information about the relationship among the Defendants and the relationship of the Defendants with Genex in order to determine which party or parties are ultimately at fault for the harm to Plaintiff. Defendants contend that none of the Defendants other than Paul Revere should be subject to discovery because only Paul Revere was involved in issuing and terminating Plaintiff's claim. For the reasons hereinafter discussed, we conclude that the relationship among the Defendants and between the Defendants and Genex are relevant and have a sufficient nexus with Plaintiff's claim to be discoverable. We therefore affirm Judge Rapoport's decision.

### a. Provident, PL & A, and Unum-Provident as Proper Recipients of Discovery and their Post–Merger Relationships

Defendants' initial argument is that Defendants Provident, PL & A, and UnumProvi-

---

**29.** Plaintiff also seeks documents related to the development of the Quality and Training Assurance Unit, alleging that such information will further explain how Defendants define quality and train employees regarding that standard. (Request 135.) This information is relevant to show the reasonableness or the unreasonableness of Defendants' actions in handling Plaintiff's claim in light of their standards.

**30.** We have addressed any potential concerns about the proprietary or confidential nature of these studies with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

dent should not be subjected to discovery because they are not proper parties to the action.[31] We reject this argument in light of the earlier order denying the motion to dismiss Provident, PL & A, and UnumProvident. (Order dated May 10, 2000, Doc. No. 18.) While we recognize that only Paul Revere made the initial contract with Plaintiff, Plaintiff's complaint alleges that Provident, PL & A, and UnumProvident were jointly involved in either the decision to terminate his benefits and/or the decision to continue to withhold his benefits. Since Plaintiff has alleged that the four Defendants violated his contract jointly as part of a common scheme or plan, the discovery of business practices should apply to all Defendants.

### b. Defendants' Relationship with Each Other

Plaintiff requests information about Defendants' merger, including newsletters and internal documents related to the merger. (Requests 66, 72, 150, 164.) Plaintiff contends that these documents are relevant to show the importing and exporting of policies and claims handling procedures and will support his allegation that all of the Defendants were responsible for the bad faith practices implemented against Plaintiff. Defendants contend that these requests seek general information about the merger of the companies that is neither related to Plaintiff's claim nor related to the company's policies regarding own-occupation policies.

Discovery of the relationships between the Defendants is relevant to questions of corporate control, alter ego, joint venture, and whether the parties acted in concert in regards to the termination of Plaintiff's benefits. Therefore, we will affirm Judge Rapoport's decision to permit this discovery.

### c. Genex's Relationship with Defendants

Plaintiff has submitted a number of requests pertaining to Defendants' relationship with Genex, the company hired by Defendants to investigate Plaintiff's disability

claim. (Requests 14–21, 67–70, 80, 109–112, 116, 119, 122–123, 186–187.) Plaintiff contends that these relationship documents will show that Defendants were responsible for the actions of the Genex employees and units, in that they knew or should have known that Genex conducted biased investigations and that Defendants' incentive structure, training, standards, and goals encouraged such improper action by Genex.

Specifically, Plaintiff requests documents that identify Defendants' standards for Genex and its opinions of Genex's work. Plaintiff seeks the agreements between Defendants and Genex and the documents exchanged between the companies about Genex's investigation, management, and evaluation of individual disability claims. (Requests 14–19.) Plaintiff also requests documents regarding Defendants' expectations generally from vendors and the feedback Defendants gave about its increased referrals. (Requests 70, 116.) Defendant contends that these requests are overly broad and do not relate to Plaintiff's specific claim. We find that these documents are relevant. However, we recognize that the request for general information regarding Defendants' standards for outside vendors will include information about its standards for vendors other than Genex. In order to avoid an overly broad request, we will require Defendants to produce only those documents that state general expectations for all vendors and specific expectations regarding Genex in the time period after Plaintiff filed his initial request for benefits, June of 1996.

Plaintiff alleges that further evidence of the relationship of Defendants with Genex, and Defendants' expectations for Genex employees is found in documents concerning the training of Genex employees. As we explained above, the training of Defendants' employees is relevant to Plaintiff's claim either when those employees were specifically involved in Plaintiff's claim or when the training was on a specific subject matter relevant to Plaintiff's claim, such as the han-

---

**31.** A set of all of the discovery materials discussed in this opinion were served on all four Defendants, and Defendants jointly filed all of the motions, briefs, and objections discussed in this opinion.

dling of own-occupation disability benefit. We will permit discovery of Genex's training to the same extent. Training information relevant to the criteria for referring files to Genex, the tracking of the files referred to Genex, the relationship of Genex with Defendants, Genex's interest in saving money for its clients, and Genex's policies regarding how to investigate claims may be discovered. (68, 109–112, 119, 122.) Plaintiff also seeks documents showing that Defendant knew about complaints or concerns regarding Genex's training of its employees and the qualifications of Genex employees. (Requests 67, 80.) While these complaints themselves are not relevant to Plaintiff's claim, Defendants' knowledge of such concerns and its reaction to them is relevant to the relationship between Defendants and Genex and whether Defendants were responsibly monitoring those Genex employees.

As part of Plaintiff's claim that Defendants' purpose in using Genex was to save money because Genex's biased investigations led to a large quantity of benefits' terminations, Plaintiff seeks reports by Defendants and Genex regarding the claims savings accomplished by using Genex. (Requests 20–21, 69, 123.) We find these documents relevant to Plaintiff's allegation regarding Defendants' bad faith policies and practices, and therefore, affirm Judge Rapoport's decision to permit this discovery.

Plaintiff also requests information regarding the specific employees at Genex who handled Plaintiff's claims in order to show that they had a practice of conducting biased investigations and to show which Defendant or Defendants were responsible for those employees actions. (Requests 186–187.) Plaintiff requests information about all of the investigations done for Defendants by those investigators and units at Genex that handled his claim. Plaintiff alleges that these documents will be important to show that the employees handling Plaintiff's claim were conducting biased investigations that almost always resulted in the termination of claims and that the Defendants received reports of these actions and, therefore, knew or should have known of them.

Plaintiff also requests payroll information for those individuals who handled Plaintiff's claim from 1996 until the present. Plaintiff wants these payroll records to show *who* was paying the individuals involved in Plaintiff's claim. Defendants allege that this information is proprietary, privileged, and confidential, specifically asserting that those individuals have a legitimate expectation of privacy in their pay records. Defendants also argue that compiling this information will take thousands of hours and involve thousands of documents, which would be unduly burdensome, especially if they are forced to redact confidential information from the payroll records.

We conclude that the Genex investigations and payroll documents are discoverable. While we recognize that the investigations involved different insureds, the history of the actions of the employees who handled Plaintiff's claim is potentially relevant to show whether those employees were conducting their business in a reasonable and responsible manner. In addition, discovery of these investigations is relevant to show whether Defendants knew or should have known of the allegedly biased actions of these employees. The discovery of the payroll records will reveal which of the Defendants was directly responsible for the actions of the Genex employees. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion. In order to protect the privacy of these documents, we direct that Defendants redact any confidential pay information on the payroll records.

### (3) Preparing for Additional Arguments

#### a. Cross Examining Claim Handlers

Plaintiff has requested the depositions or affidavits of the employees who handled Plaintiff's claim or their supervisors in other cases involving allegations of bad faith, unfair claim practices, consumer fraud, or breach of the covenant of good faith and fair dealing. (Requests 10–11.) Defendants object that previous bad-faith actions are not relevant to present bad-faith actions, citing several Eastern District of Pennsylvania de-

cisions denying the discovery of previous bad-faith cases because they "will necessarily involve totally different facts and circumstances from those present here." *Kaufman*, 1997 WL 703175 at *2. None of the cases cited by Defendants discuss similar discovery requests for previous sworn statements made by employees who handled a plaintiff's claim. While we recognize that the circumstances of the other bad-faith cases will differ from the facts of the instant case, we find it reasonable to conclude that the previous statements of the employees may well be relevant or may lead to relevant evidence in this case. Since these statements were made by the claims handlers involved in denying Plaintiff's claim, there is a sufficient nexus between the statements and the alleged harm to Plaintiff. Therefore, we affirm Judge Rapoport's order to disclose these sworn statements as not contrary to law or an abuse of discretion. If any of these statements contains information that is not a matter of public record and/or reveals confidential information about other insured litigants, the names of those litigants should be redacted in order to ensure their privacy.

### b. Rebutting Defendants' "Return to Work" Arguments

Plaintiff has requested any documents that support Defendants' contention that some percentage of the individuals insured under the same type of policy as Plaintiff were capable of returning to work after their benefits were terminated.[32] (Request 220.) We discuss this issue later when addressing Defendants' Fourth Motion for a Protective Order, which requests similar information in interrogatories. As we explain, if Defendants choose to make the "return-to-work" argument, the requested information is relevant to analyze Defendants' claim and rebut it. Therefore, we will require Defendants to compile the statistical information requested by Plaintiffs in their Third Set of Interrogatories. We will not require Defendants to produce all of these claims files in the original.

### C. Defendants' Third Motion for a Protective Order

Defendants have objected to Judge Rapoport's January 3, 2001 order denying their Third Motion for a Protective Order, which addressed Plaintiff's Notices of Deposition and accompanying subpoena duces tecum of a corporate designee of Genex and each of the Defendants, the Notice of Deposition accompanying the subpoena duces tecum for in-house counsel, Maureen Griffen, and the subpoena duces tecum of Goldstein, Alvino, Wyman, Moore, Yranski, Speroni, Goyette, Silverberg and Martinez.

#### i. Deposition of Corporate Designee of Genex

Plaintiff seeks to take a 30(b)(6) deposition of Genex regarding six issues: (1) investigation, evaluation and processing of Plaintiff's claim; (2) the business relationship between Genex and the defendant companies; (3) "savings" and "savings estimation" as a result of terminating Plaintiff's claim in particular; (4) the reporting of savings and savings estimations to defendant companies by Genex; (5) the training of Genex personnel in the investigation or evaluation of disability claims and insurance practices; and (6) the training of Genex personnel with respect to disability contract reading and interpretation.

Defendants object to the deposition on issues 2–6, claiming that they are not relevant to Plaintiff's claim and that the information should be protected because it is proprietary, confidential, and privileged. The business relationship between Genex and Defendants is relevant to establish whether Defendants knew of or recklessly disregarded the alleged improper investigation by Genex's employees. Information regarding the possible savings to Defendants that could be created by terminating Plaintiff's claim and whether

---

**32.** Plaintiff has also requested any documents describing Defendants' process for developing termination data, which would assist Plaintiff in interpreting that data and any statistics regarding the "return-to-work" policy that Defendants create. (Request 105.) If Defendants are going to make a "return-to-work" argument at trial, Defendants' process for developing termination data will be an important aspect of Plaintiff's ability to rebut that argument. Therefore, we will affirm Judge Rapoport's decision to permit discovery of those documents.

those savings estimates were communicated to Defendants is also relevant. Such information may establish a motive for bad-faith actions and a policy of communicating such information could reasonably imply a bad-faith policy or practice.[33]

As we have explained above, we consider information regarding the training of the employees who handled Plaintiff's claim to be relevant and will permit discovery of that information. Because Plaintiff's current request is limited to training on the subject matters at hand, we are unsure whether Plaintiff's request is functionally any different from his previous request for information about the training of the personnel who handled his claims. Should there be such a distinction, we will limit the deposition testimony to include only those training programs to which the employees who handled Plaintiff's claim were subject. We also direct that any claims or training manuals produced in the deposition not be exchanged or disclosed by Plaintiff to anyone not associated with this case. Based upon the foregoing, we find that Judge Rapoport's decision to require the Genex deposition and subpoena duces tecum was reasonable and we affirm it as modified.

### ii. Deposition of Corporate Designee of Defendants

Plaintiff seeks to take a deposition of the corporate designees of Defendants in order to obtain the corporations' explanation of their claims-handling process. Plaintiff explains that he needs an official explanation of the Defendants' claims handling process, and that the individual claims handlers are incapable of giving such an explanation. Defendant objects to this information as cumulative and unnecessary. In addition, Defendant objects to the savings estimation and training information.

We reiterate our earlier determinations on the savings estimations and training information. We also find that Plaintiff is entitled to depose the corporate designees and obtain an official explanation of the claims-handling policies.

### iii. Deposition of Counsel Maureen Griffen

Plaintiffs seek a deposition with UnumProvident attorney Maureen Griffen, alleging that Ms. Griffen was involved in handling Plaintiff's claim before the institution of the suit. Defendants object to Ms. Griffen's deposition, alleging that Ms. Griffen worked as an attorney in this case in anticipation of litigation and that any information she has is protected as attorney-client privilege or work product.

Under Pennsylvania state law, the party asserting privilege has the initial burden of proving that the privilege is properly invoked.[34] *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, Civ. A. No. 00–3683, 2001 WL 605199, *2 (E.D.Pa. May 31, 2001). To do this, the party resisting discovery must demonstrate:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made is a member of the bar of a court, or his or her subordinate, and is acting as a lawyer in connection with the communication; (3) the communication relates to a fact of which the attorney was informed by the client without the presence of strangers for the purpose of securing primarily either an opinion of law, legal services, or assistance in some legal proceeding, and not for the purpose of committing a crime or tort; and (4) the privilege has been claimed and not waived by the client.

*Id.* at *3 (citing *Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir.1994)). In addition, the party claiming a work product privilege has the burden of showing that the materials at issue were prepared in anticipation of litigation. *Id.* at *4. Commonly, the party asserting the privilege demonstrates a need for the privilege by submitting the papers in question or an affidavit by the attorney or a privilege log. *See*

---

**33.** Plaintiff has submitted material from his claim file that refers to a "savings and savings estimation." (Pl. Opp. to Defs. Third Mot., Ex. 1.)

**34.** Pursuant to the Federal Rule of Evidence 501, we apply state law to determine the applicability of any evidentiary privileges in diversity actions alleging state law claims.

*United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996).

In the instant case, we find that Ms. Griffen has information relevant to the handling of Plaintiff's claim and that Defendants have not submitted any information to support their bald and conclusory assertions of privilege. Therefore, we conclude that her deposition and the subpoena duces tecum are not subject to a protective order, and we affirm Judge Rapoport's order.[35]

### iv. Subpoena Duces Tecum of Relevant Employees

Plaintiff seeks to have a number of employees who handled Plaintiff's claims bring documents that they have in their possession to their depositions. Defendants argue that this request is overbroad and not limited in time or scope. To the extent that these claims handlers have possessed these documents, they are relevant. It is reasonable to believe that if the employee had these documents they were read or considered by the employee, and, therefore, could have influenced the actions of the employee. Therefore, we affirm Judge Rapoport's decision to deny Defendants' protective order in this regard.

### D. Defendants' Fourth Motion for a Protective Order

■ Defendants' Fourth Motion for a Protective Order objects to Plaintiff's Third Set of Interrogatories, which consist of four questions submitted to each of the individual Defendants, requesting statistical information relating to the authorization and/or institution of rehabilitation plans under their policies. (Requests 20–24, Def. Fourth Mot. for Protective Order, Doc. 42, Ex. "A".) Defendants argue that because Plaintiff's claims do not involve a rehabilitation plan, information about the rehabilitation of other parties is irrelevant and not likely to lead to the discovery of relevant evidence. Furthermore, Defendants argue that the three Defendants other than Paul Revere had nothing to do with Plaintiff's insurance contract and should not be forced to produce this information about their own policies. Defendants also argue that compiling the statistical information will require a laborious manual search through thousands of claims files, which is an undue burden, and that the confidential information in the files prevents them from permitting Plaintiff to compile the information himself.

Plaintiff alleges that he has requested this rehabilitation information in anticipation of Defendants' possible trial strategy of claiming that when they terminate benefits, many of their claimants return to work. Plaintiff has provided this Court with evidence that Defendants have made a similar "return to work" statistical argument in previous cases to rebut claims of bad-faith termination of claims.[36] (Pl. Memo. of Law., Doc. No. 48, Exs. "4", Provident's Offer of Proof Re: The Testimony of Ray Warren at 1.) If Defendants make such an argument, Plaintiff would need the presently requested data to rebut the accuracy and reliability of Defendants' statistical argument. Since the files are confidential, Defendants will have to compile the information themselves. Plaintiff has offered to withdraw his requests for this statistical information if Defendants would agree not to make this argument at trial. (Pl. Reply to Defs' Objs., Doc. No. 60, ¶ 8.) However, Defendants have refused to make such an agreement. (*Id.*) Under the circum-

---

35. We note that this analysis regarding the attorney-client privilege is applicable to all of Defendants' allegations of such confidentiality throughout these motions. (Requests (29, 30, 31, 63, 131, 132, 160, 169, 170, 197, and 198.)) Defendants have had more than ample opportunity in the numerous motions filed before this Court to supply to the Court with detailed explanations of why these discovery requests will interfere with the attorney-client privilege. Defendants have failed to do so. This burden rests on the Defendants. The Defendants are the ones that know the exact contents of these requested documents and what attorney-client privilege information they contain.

36. Specifically, Provident has previously offered statistical testimony to show that Provident paid at least 95 percent of all of its claims submitted during the period in question. That evidence was offered to rebut Plaintiff's claim that Provident had undertaken a pattern and practice of wrongfully denying disability insurance claims. (Pl. Memo. of Law., Doc. No. 48, Ex. "4", Provident's Offer of Proof Re: The Testimony of Ray Warren at 1.)

stances, we agree with Judge Rapoport's decision that this discovery is relevant to Plaintiff's case and will not cause Defendants an undue burden. Since Defendants have failed to show that Judge Rapoport's Order was contrary to law or an abuse of discretion, we will affirm that order.

### E. Defendants' Fifth Motion for a Protective Order

Defendants' Fifth Motion for a Protective Order objects to Plaintiff's Fourth Set of Interrogatories, Third Set of Requests for Admissions and Fourth Set of Requests for Production of Documents. Because this motion for a protective order was submitted after Magistrate Judge Rapoport made his rulings, these discovery requests are being addressed for the first time; however, most of the issues are not new.

#### a. Fourth Set of Requests for Production of Documents

■ In this Fourth Set of Requests for Production of Documents, Plaintiff seeks documents that it contends are relevant to the relationship of Defendants to each other, the alleged bad faith policy of Defendants to terminate claims, the alleged success of that policy, and the pressure on employees to terminate claims. Defendants contend that only Paul Revere should be subject to discovery and that the requested documents are irrelevant, lack a nexus to Plaintiff's claim, are onerous, and some are confidential. As we have explained above, we find that generally information regarding these subjects is relevant, has a nexus to Plaintiff's specific harm, and all of the Defendants are subject to this discovery. However, we will address these requests individually in order to determine whether they will provide the information sought and whether they are overly broad for those requested purposes.[37]

In request 230, Plaintiff seeks Board of Director's Meeting Minutes from January 1997 to the present. Plaintiff contends that these documents will provide information about the relationships between the parties. For example, Plaintiff has evidence that Paul Revere only had one Board of Director's Meetings separate from the other Defendants in the above time period, and that information potentially supports an alter ego theory of liability. This information is potentially relevant to liability between the Defendants. Therefore, we will deny Defendants Motion for a Protective Order.

■ Plaintiff has requested a number of documents regarding Defendants' setting of termination goals and their tracking of their own progress meeting those goals. (Requests 232–242.) Plaintiff seeks the Monthly Trend Reports for the last five years, which Plaintiff contends track the progress in closing claims and meeting net resolution ratio goals, as well as the net termination goals for the past five years. (Request 232, 241.) Plaintiff also seeks financial and reserve documents for the past five years, which Plaintiff contends show the setting of financial goals for the closing of claims and release of reserves for all of the Defendants and specifically for the unit that handled Plaintiff's claim. (Requests 233–236.) Plaintiff requests the monthly projections for claim resolutions from the units handling Plaintiff's claim as well as any management memos relating to the setting of goals for closing claims. (Request 237.) Plaintiff also seeks documents that track or discuss the liability acceptance rate for own-occupation policies like Plaintiff's and for the unit handling Plaintiff's claim. (Requests 239–242.) These documents allegedly measure the performance of the different products and units. We find that all of these requests are relevant to Plaintiff's allegation that Defendants had a bad faith policy of terminating claims in order to save money. These documents also have a sufficient nexus with Plaintiff's specific harm because they are related either to the claims units handling Plaintiff's claim,

---

37. While the title of Defendants' motion implies that they seek a protective order for all of the documents requested in Plaintiff's Fourth Set of Requests for Documents, Defendants motion and memorandum of law does not specifically address all of the requested documents. Because Defendants have the burden in obtaining a protective order, we will permit discovery without discussion for those requests that were not addressed by Defendants. (Requests 223–229, 231.)

own-occupation policies like the Plaintiff's, or the specific subject of the bad faith policy of terminating claims, which Plaintiff alleges was the reason his claim was terminated.

■ Plaintiff also seeks information about Defendants involvement in other bad-faith cases, which Plaintiff contends will show similar issues of misconduct, and will help establish corporate policies as well as show Defendants' recidivism and reprehensibility. (Requests 243–249.) As we explained above, previous bad-faith actions are generally not relevant to present bad-faith actions because they "will necessarily involve totally different facts and circumstances from those present here." *Kaufman*, 1997 WL 703175 at *2. While the specific facts of every case are different due to the specific circumstances of the Plaintiff, we find that other bad-faith cases in Pennsylvania, during the time that Plaintiff was requesting benefits, that involve termination of benefits for own-occupation, non-cancelable, guaranteed renewable policies by the same unit as was involved in Plaintiff's case, would be potentially relevant to Plaintiff's case and should be subject to discovery.[38] Therefore, we will permit discovery of settlements of such cases in which Defendants entered into a non-confidential settlement with value in excess of the present value of contract benefits. In addition, we will permit discovery of any documents related to changes in education or procedures that resulted from such a settlement. For those cases that alleged similar bad-faith actions in their complaints but resulted in confidential settlements, we will permit Plaintiff to discover a list of those civil actions.[39] We will grant Defendants' request for a protective order as to all of the other documents requested pertaining to other

bad-faith actions. That other litigation is remote from Plaintiff's case and is not likely to produce evidence relevant to Plaintiff's case.[40] (Requests 246–249).

**b. Plaintiff's Third Set of Requests for Admission**

■ Plaintiff has submitted fifty-three requests to each of the defendants requesting that Defendants admit the authenticity of documents that Plaintiff has obtained through other litigation, and admit that those documents were authorized, are products of regularly conducted activity, and constitute statements made within the scope of employment. Defendants object to these requests as being overly broad, seeking general practice information that is remote in time to the matters at issue in Plaintiff's claim. While we might have been inclined to limit the scope of these admissions to a specific time period, we find that Defendants' general statements about their concerns regarding these admissions do not meet the burden required to establish a need for a protective order. Even though Defendants objected to a specific category of the documents, they failed to indicate which of the fifty-three requests for admission contained those categories of documents. To determine the merits of Defendants' allegations, this Court would be forced to examine each of the fifty-three requests and determine when those documents were created. That is not our role. The Third Circuit has made clear that the burden for a protective order is on the moving party and that the moving party must demonstrate good cause beyond bald assertions of harm for each specific request that it wants protection from.[41] Authenticat-

---

38. This definition is somewhat more limited than the one presented by Plaintiff in Request 242.

39. Plaintiff also requests documents related to Defendants' procedures for the entry or enforcement of confidential settlement agreements, alleging that these policies will show Defendants policy to hide their misconduct. Even if Defendants have stringent policies to enforce their confidential settlement agreements or have a policy of always obtaining confidential agreements, this information would not be direct evidence of Defendants' bad faith or attempts to hide their misconduct. Because of the limited potential relevance of these documents, we will grant De-

fendants motion for a protective order regarding these documents. (Request 245.)

40. In these requests, Plaintiff sought records of other similar bad-faith cases that were filed throughout the nation or were filed before Plaintiff's requests for benefits in June of 1996.

41. We note that *Pansy* does not require the moving party to address every discovery request specifically, especially when there are so many discovery requests. However the moving party must attempt to address the requests with some specificity, for example, by grouping the requests

ing these documents does not appear to this Court to create an undue burden on the Defendants. We will deny Defendants Motion for a Protective Order to prevent their response to these requests for admission.[42]

### c. Plaintiff's Fourth Set of Interrogatories

Plaintiff submits two interrogatories, the first asking whether Plaintiff's policy was reinsured individually or as a block of business and the second asking whether Defendants believe that unreasonable delay or denial of disability insurance benefits is lawful in any of the fifty states, and if it is, to identify which one. (Interrogatories 24–25.) Plaintiff alleges that if such reinsurance exists for Plaintiff's policy, communications between Paul Revere and its reinsurer could contain admissions against interest regarding Paul Revere's opinion of Plaintiff's claim for disability benefits because insurers have a duty to inform reinsurers about outstanding claims. Defendant objects that these interrogatories are beyond the scope of permissible discovery and will not lead to admissible evidence. We disagree. If Plaintiff's insurance policy was reinsured and Defendants have had non-confidential communications regarding their state of mind concerning Plaintiff's request for disability benefits, that information is relevant to Plaintiff's claim. Therefore, we will deny Defendants Motion

for a Protective order regarding Interrogatory No. 24.[43]

An appropriate order follows.

### *ORDER*

AND NOW, this 13th day of August, 2004, upon consideration of Defendants' Objections to Magistrate Judge Arnold C. Rapoport's Orders dated January 3, 2001, and March 6, 2001, and Defendants' Fifth Motion For Protective Order, it is ORDERED as follows:

1. Defendants' Objections are OVERRULED to the extent provided in the attached Memorandum.

2. The Orders of Judge Rapoport dated January 3, 2001 and March 6, 2001 are AFFIRMED as modified by the attached Memorandum.

3. Defendants' Fifth Motion For Protective Order is GRANTED in part and DENIED in part, as provided in the attached Memorandum.

IT IS SO ORDERED.

by subject matter, as Defendants did above when discussing personnel records.

42. Because Plaintiff has not shown the "nexus" between each individual document and the specific harm alleged in this case, we limit this "authentication" request to only those "types" of documents which we have previously found sufficiently related to the present case. *See State Farm,* 123 S.Ct. at 1522.

43. The parties have not specifically addressed in their pleadings why interrogatory No. 25 would either be relevant to the instant case or why the production of the information would be onerous for Defendants. Since the interrogatory calls for Defendants' interpretation of the law in fifty states and Plaintiff can only recover in the instant case for the harm done to Plaintiff in Pennsylvania, we find that Plaintiff's request is too remote for discovery in the instant case. Therefore, we will grant Defendants' Motion for a Protective Order as it applies to Interrogatory No. 25.